# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-1207

_____

Kearney Regional Medical Center, LLC,

*Plaintiff - Appellant,*

v.

United States Department of Health and Human Services; Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services,[1]

*Defendants - Appellees.*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 15, 2018
Filed: August 19, 2019

_____

Before SMITH, Chief Judge, BEAM and COLLOTON, Circuit Judges.

_____

_____

[1]Secretary Azar is substituted for his predecessor under Federal Rule of Appellate Procedure 43(c)(2).

COLLOTON, Circuit Judge.

Kearney Regional Medical Center, LLC, sought judicial review of a decision by the Departmental Appeals Board of the United States Department of Health and Human Services to deny Kearney Regional's application to participate in the Medicare program. The facility later received approval, but the initial ruling prevented Kearney Regional from participating in Medicare and receiving reimbursements for eighty-seven days during 2014. The district court granted summary judgment in favor of the Department, and Kearney Regional appeals. We conclude that the Board failed adequately to explain the legal standard that it applied in resolving Kearney Regional's administrative appeal, and we therefore reverse and remand with directions to return the case to the agency.

I.

Kearney Regional is a recently constructed, physician-owned hospital facility that serves patients living in rural Nebraska and Kansas. Construction was completed in 2013, and the facility received its license to operate from the State of Nebraska on December 9, 2013. From December 9 to December 30, Kearney Regional admitted and provided care to twenty-one inpatients. The facility could not bill Medicare for services provided during this period, however, because it had not yet acquired the necessary approval from the United States Department of Health and Human Services.

To receive payments for providing Medicare-covered services, a facility like Kearney Regional must first enter into an agreement with the Secretary of the Department of Health and Human Services. 42 U.S.C. § 1395cc(a)(1). The Secretary, in turn, may refuse to enter an agreement with a provider that fails substantially to meet a host of statutory and regulatory requirements. *See id.* § 1395cc(b)(2); 42 C.F.R. §§ 482.1-482.104. To evaluate a provider's compliance

-2-

with those requirements, the Secretary may rely on accreditation by an approved state or private accrediting body, such as the American Osteopathic Association. 42 U.S.C. §§ 1395aa, 1395bb(a)(1). By regulation, an accrediting body may conduct a survey of the applying provider and may recommend that the Department deem the provider to be in compliance with the relevant statutory and regulatory requirements. 42 C.F.R. § 488.4(a). The Department, through the Centers for Medicare & Medicaid Services, then determines for itself whether the provider has met all the applicable requirements "on the basis of its own investigation of the accreditation survey or any other information related to the survey." *Id.* § 488.7(a).

A provider seeking to participate in Medicare must meet the applicable statutory definition for that category of provider. *See* 42 U.S.C. § 1395cc(b)(2)(B); 42 C.F.R. § 488.3(a)(1). Kearney Regional sought approval to participate as a "hospital." The Medicare Act defines a "hospital" as an institution that, among other things, "is primarily engaged in providing" certain services "to inpatients." 42 U.S.C. § 1395x(e)(1).

Kearney Regional filed an application on December 18, 2013, for a branch of the American Osteopathic Association to assist with its Medicare certification. The Association conducted an accreditation survey at the facility from January 13-15, 2014. Kearney Regional discontinued serving inpatients on December 30, and had no inpatients when the Association visited in January. But the lead surveyor said that was not a problem because the survey could rely on records and interviews of patients who were previously admitted.

On Friday, February 7, the Association granted accreditation and recommended that the Department deem Kearney Regional qualified to participate in Medicare. Kearney Regional resumed admitting inpatients the following Monday, February 10.

On April 9, however, the Centers for Medicare & Medicaid Services (CMS) determined that Kearney Regional did not qualify for participation in the Medicare program. CMS concluded that Kearney Regional did not meet the definition of a "hospital" under the relevant statute. The decision letter explained that because there were no inpatients at the time of the survey in January, and the last inpatient discharge prior to the survey occurred on December 30, Kearney Regional was not "primarily engaged in" providing care to inpatients. *See id.*

Kearney Regional requested reconsideration, and CMS affirmed its decision. The decision letter cited the fact that Kearney Regional "was not providing services to any inpatients at the time it was surveyed . . . and indeed had not provided any services to inpatients for a period of time prior to that survey."

The facility requested a hearing before an administrative law judge, and the ALJ affirmed CMS's reconsidered determination. The ALJ defined the issue as "[w]hether CMS had a legitimate basis for denying [Kearney Regional's] participation in the Medicare program as a provider (hospital) because [Kearney Regional] did not have any inpatients at the time of its accreditation survey." The decision then observed that Kearney Regional "did not have any inpatients from December 30, 2013, until February 10, 2014, which is 42 days." And the ALJ concluded that Kearney Regional was not "primarily engaged" in care for inpatients "immediately prior to or following the survey that took place in January 2014."

The Departmental Appeals Board affirmed the ALJ's decision. The Board reasoned that a facility is "primarily engaged" in serving inpatients when "the bulk of its present activity consists of providing the required services to treat inpatients." The Board thought the determination did not turn on "what activities the facility previously engaged in, or plans to engage in, or is equipped to engage in, but on what its central activity currently <u>is</u>." The Board then emphasized that "Kearney admitted a handful of patients for only a few weeks before affirmatively deciding to suspend

-4-

all admissions and then continued to operate with no inpatients for more than five weeks." The decision opined that "the ALJ reasonably concluded here that a history of providing inpatient care for about three weeks (and that outside of the Medicare program) does not outweigh a period of almost twice as long (more than five weeks) in which Kearney engaged in no inpatient care."

Discussing the relationship between the CMS reconsideration decision and the ALJ's decision, the Board explained that "CMS is limited to the legal basis or bases given for its action in the reconsideration decision." In response to Kearney Regional's complaint that the ALJ deviated from the reconsideration decision by relying on dates *after* the survey when the facility still had no inpatients, the Board saw no error. The Board characterized the basis for denial as a finding that Kearney Regional "failed to meet the definitional requirement to be primarily engaged in treating inpatients," and said that the ALJ "did not err in considering all the evidence in the record that bore on that basis."

Kearney Regional sued the Department and the Secretary in the district court, alleging that the Board's decision should be set aside. The district court thought the statute requiring a facility to be "primarily engaged in" the treatment of inpatients was ambiguous, because it "does not specifically provide a time for which the CMS may base its determination." The court thus applied the framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and considered the reasonableness of the agency's interpretation of the statute. The court concluded that "it is reasonable to interpret 'presently [sic] engaged' to include the prospective provider's history to the time when CMS receives a recommendation from the accrediting organization." The court then determined that substantial evidence supported the Board's determination that Kearney Regional "did not meet the definition of a hospital at the relevant time," and granted summary judgment for the agency.

II.

Kearney Regional contends that the Board's decision should be set aside because it applied an impermissible legal standard when determining whether Kearney Regional was "primarily engaged in providing" inpatient services. 42 U.S.C. § 1395x(e)(1). Kearney Regional complains that the agency applied different legal standards throughout the administrative review process, and that the Board's ultimate interpretation is incompatible with the statute. Among other things, Kearney Regional contends that the Board "cherry-picked" a range of dates for evaluating the facility's provision of inpatient services in order to deny approval. We review the decision of the Board as the final decision of the Secretary. *See id.* § 1395cc(h)(1)(A); 42 C.F.R. § 498.5(c); *Horras v. Leavitt*, 495 F.3d 894, 899 (8th Cir. 2007).

The Medicare Act establishes that a provider is entitled to judicial review of a decision denying participation in the program according to 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1395cc(h)(1)(A). Under § 405(g), we consider whether the Secretary's decision is supported by substantial evidence on the record as a whole and whether it correctly applied the relevant legal standards. *Beeler v. Astrue*, 651 F.3d 954, 959 (8th Cir. 2011). As *Chevron* remains governing precedent, a reviewing court proceeding under § 405(g) applies traditional tools of statutory construction to discern the meaning of a statute, *Chevron*, 467 U.S. at 843 n.9, and, in a case of true ambiguity, generally defers to the Secretary's reasonable interpretation of a statute that he administers. *Sullivan v. Everhart*, 494 U.S. 83, 88-89 (1990); *see Friedman v. Sebelius*, 686 F.3d 813, 819 (D.C. Cir. 2012).

To resolve a legal challenge, however, we must be able to discern what legal standard the agency applied. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). If the Board does not adequately explain the standard on which its decision is based, then we cannot determine whether the agency's interpretation of the statute

was correct or reasonable. In that event, we have no recourse but to remand the case to the agency for further explanation. *See Kidney Ctr. of Hollywood v. Shalala*, 133 F.3d 78, 87-88 (D.C. Cir. 1998); *Hazardous Waste Treatment Council v. EPA*, 886 F.2d 355, 374-75 (D.C. Cir. 1989) (Silberman, J., concurring in part and concurring in the result); *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 & n.3 (11th Cir. 1982).

As the district court observed, a key issue in determining whether a provider is "primarily engaged in" providing services to inpatients is identifying *the proper time frame* for evaluating the provider's activities. Does the agency consider only the dates of the accreditation survey? Or the dates of the survey plus some particular period of time before and after the survey? Or the period from when the new facility opened through the end of the accreditation *survey*? Or the period from when the facility opened through the accreditation *decision*? Or the period from when the facility opened through the decision *by CMS*? Where, as here, a facility was engaged in providing inpatient care during some, but not all, of the dates in these ranges, the relevant time period dictated or permitted by the statute may be dispositive.

Unfortunately, the agency's position on the relevant time period in this case has been a moving target. CMS's initial denial observed that Kearney Regional had no inpatients at the time of the survey on January 13-15, 2014, and that the last inpatient discharge prior to the survey occurred on December 30. The reconsideration denial cited the fact that Kearney Regional was not providing services to inpatients at the time of the survey and "indeed had not provided any services to inpatients for a period of time prior to that survey." The reconsideration decision thus suggests that CMS defined the relevant time period as the three-day survey from January 13-15, plus the period before the survey (December 30 to January 12) when the facility had no inpatients.

Reviewing CMS's reconsideration decision, the ALJ then defined the issue as whether CMS had a legitimate basis for denying the application "because [Kearney

Regional] did not have any inpatients *at the time of its accreditation survey*." R. Doc. 19-2, at 3 (emphasis added). But after suggesting that the relevant time period was only the survey dates (January 13-15), the ALJ cited a much broader time frame in relying on Kearney Regional's admission that "it did not have any inpatients from December 30, 2013, until February 10, 2014, which is 42 days." The ALJ then concluded that Kearney Regional was not "primarily engaged" in care for inpatients "immediately prior to or following the survey that took place in January 2014." This conclusion suggests that the relevant time period was January 13-15, 2014, and some undefined period "immediately" before and after it.

When the case reached the next level, the Board reiterated its position that "CMS is limited to the legal basis or bases given for its action in the reconsideration decision." As noted, the reconsideration decision referred only to the dates of the survey and a limited period *before* the survey: Kearney Regional "was not providing services to any inpatients at the time it was surveyed . . . and indeed had not provided any services to inpatients for a period of time prior to that survey." At the same time, however, the Board said that the ALJ did not err in considering "the full period in which no inpatients were served," including the period *after* the survey from January 16 to February 10. According to the Board, that evidence "bore on" whether Kearney was "primarily engaged in treating inpatients." In its analysis, however, the Board indicated that it was considering an even broader time period of more than eight weeks before and after the survey: "Here, Kearney admitted a handful of patients for only a few weeks before affirmatively deciding to suspend all admissions and then continued to operate with no inpatients for more than five weeks."

This litany demonstrates that the Board never came to grips with a key legal issue in the case: what is the relevant time period for assessing whether Kearney Regional was "primarily engaged in" providing care to inpatients. The Board defined the "basis for the denial" as Kearney's failure to show that it was "primarily engaged in treating inpatients." But by expressing indifference among the various time

periods—the CMS reconsideration denial based on December 30 through January 15, the ALJ's decision considering December 30 through February 10, and the Board's analysis relying on dates from December 9 through an unspecified date in February "more than five weeks" after December 30—the Board failed to explain how it defined the relevant time period.

The district court, accepting the Department's apparent litigating position, concluded that "it is reasonable to interpret 'presently [sic] engaged' to include the prospective provider's history to the time when CMS receives a recommendation from the accrediting organization." But the Board never identified the date of the accreditation recommendation (February 7) as the proper ending date for its analysis. The suggested ending date of February 7 also conflicts with the Board's conclusion that activity through February 10—considered by the ALJ and cited by the Board as the end of a "42-day voluntary gap" in providing services—"bore on" whether Kearney Regional was "primarily engaged" in providing inpatient care. And the district court's understanding of the Board's time frame is hard to square with the Board's insistence that it is limited to reviewing the legal basis given in the CMS reconsideration decision, which made no reference to dates after the survey ended on January 15 or to the "provider's history" of inpatient care from December 9 through December 30.

Having wrestled at length with the problem, we are simply unable to discern what meaning the Board attributed to § 1395x(e)(1) and the definition of "hospital." Without an adequate explanation for what time period the agency considered in determining whether Kearney Regional was "primarily engaged" in providing care to inpatients, we are unable to resolve whether the Board's decision correctly applied the relevant legal standards.

\*  \*  \*

For these reasons, the judgment of the district court is reversed, and the case is remanded with directions to return it to the agency for further proceedings.

_____